Bertie Ann DAVIS, Petitioner,

v.

UNITED TRANSPORTS, INC., and State Industrial Court of the State of Oklahoma, Respondents.

No. 40401.

Supreme Court of Oklahoma.

Jan. 26, 1965.

Rehearing Denied June 22, 1965.

Josh J. Evans, Vinita, for petitioner.

Harley E. Venters, Oklahoma City, ·Charles R. Nesbitt, Atty. Gen., for respond·ents.

BERRY, Justice.

Bertie Ann Davis, hereinafter referred to as claimant, filed a claim before the State Industrial Court on behalf of herself and her four minor children to obtain an award under the death benefit provisions of the Workmen's Compensation Act. An order denying an award was entered and this proceeding is brought by claimant against United Transports, Inc., to review the order.

The record discloses that claimant is the widow of Walter D. Davis, hereinafter called deceased.

The agreed facts were that on March 14, 1961, deceased received an accidental personal injury to his head when he struck it on a piece of angle iron while walking through a trailer. On May 16, 1961, while on the job, deceased was stricken and pronounced dead on arrival at a hospital. The cause of death was a ruptured aneurysm of the brain.

The only issue was whether the employee's death on May 16, 1961, was a result of the injury on March 14, 1961.

Loren Honeycutt testified on behalf of claimant. He testified that he was a coemployee of deceased; that deceased was the Manager of the Tulsa Terminal of United Transports, Inc.; that United Transports hauls new automobiles to various points in Oklahoma and the Texas Panhandle; that it was deceased's duty to supervise the loading and unloading of cars at United Transports' terminal in Tulsa; that he was in charge of three mechanics in the shop; that he purchased all the parts for the shop; that deceased was responsible for the entire operation; that approximately a month before deceased's death, deceased complained to him about having "dizzy" spells two different times.

Elvie Wells testified on behalf of claimant. His testimony was that he was employed by United Transports; that deceased, in addition to being manager, shop foreman, loading supervisor and parts man, also checked the truck logs to see if the drivers were driving correctly and that this work

was done at night; that deceased did repair work to the buildings such as putting in an electrical or gas conduit in the shop; that approximately one month before deceased died, he observed deceased when he said he was "dizzy"; that he saw the deceased just a few minutes before he died and that he didn't notice anything wrong with him.

Francis Bresnehan, testifying for claimant, stated that on March 14, 1961, he was working with deceased when deceased "bumped" his head on a "crossbar on the truck"; that it made a "cut" approximately one and one-half inches on deceased's head; that he took deceased to a clinic where the gash was stitched up; that the blow "dazed" deceased; that he was "unstable on his feet"; and was a "little slow in his conversation", that later, on two different occasions, deceased complained of "having dizzy spells"; that he was with deceased at approximately 1:00 o'clock p. m. on May 16, 1961, when he died; that he did not notice anything unusual about deceased at that time; that in fact deceased seemed to be in "good spirits"; that he and deceased went into a parts room to get some nails; that deceased had kneeled down to sort some nails; that deceased said "Oh" "or made some noise to that effect" and put his hand to his head; that deceased did not fall forward; that witness tried to get him out of that kneeling position; that deceased was rigid and that witness called another workman to help him lay deceased down; that he had heard deceased complain about being "dizzy" on two occasions; that approximately three weeks before deceased died deceased was pale and didn't act "like he felt as good as normal."

Bill Helen testified on behalf of claimant. He said he had known deceased for ten years before his death; that deceased was in witness's home on Sunday before he died on Tuesday; that deceased "just wasn't as normal and alert as he normally was; he had a tired, drawn appearance."

Claimant testified that on the day deceased cut his head he complained of a headache; and approximately three weeks after the accident he started complaining of headaches and that this continued until he died; that she authorized an autopsy on deceased. On cross-examination, claimant stated that deceased never lost any time from work because of the cut on his head and at the time of his death the scar was not noticeable; that deceased never made a claim for compensation because of the injury and that deceased never did relate his headaches to the blow on his head; that deceased did not go to a doctor from the time he bumped his head until he died.

Dr. L. testified on behalf of claimant. He testified that he was a physician and pathologist and that he had read the autopsy report and also that he had examined certain slides which were taken from the organs of deceased at the time of the autopsy; that he had seen the death certificate which showed that deceased had died from a ruptured aneurysm which was congenital; that he was in agreement with the autopsy findings that the cause of death was "as a consequence of a rupture of a congenital intracranial aneurysm"; that "as a rule a physical trauma is not believed to play any role directly, by concussion or otherwise, upon the rupture of this type of injury" but that "stress and strain, if associated with increased blood pressure, could be a contributory to the rupture of an aneurysm"; that in his opinion "an increase in arterial pressure is quite apt to cause a fatal hemorrhage, as in this case." On cross-examination Dr. L. testified that aneurysms can rupture with normal blood pressure; that he did not have any history that deceased had any abnormal blood pressure prior to his death, "on the contrary, I have stated that nothing has been known about the blood pressure."

The only evidence in the record pertaining to deceased's blood pressure was a written report of Dr. O. that on March 4, 1960, deceased's blood pressure was 130/70.

Dr. K. D. testified for claimant. He testified he was a neurologist; that he had read the autopsy report; that he had never

seen the deceased but was testifying from the report; "that the trauma directly did not rupture the aneurysm"; that "You cannot tell from the autopsy protocol what killed the man"; that "I do not feel it is clear at this time what caused this man's death"; that "You cannot say definitely that it is this, or it is this, or it is this."

"Q. * * * Ah, Ah, could the fact that he had pressure, stress and strain from the job, and they were kinda all connected together, could that explain why he had this sudden and violent rupture that caused him almost sudden death?

"A. I testified that I did not feel that this caused his death.

* * * * * *

"Q. Well, if you had trauma; this man had trauma, had an injury on March 14. In other words, could the combination of the two?

"A. I don't think they would. * *"

On cross-examination, Dr. K. D. testified:

"Q. * * * Did this blow that he received on March 14 cause or precipitate his death on May 16, 1961, according to your opinion?

"A. I have stated I thought it was a factor, yes, sir.

* * * * * *

"Q. What kind of a factor?

"A. I stated that it produced a clinical situation characterized by ill health and complaints. This was after the blow. That, with a stressful situation, led into the fluctuated blood pressure; these two things together brought about rupture of the aneurysm.

* * * * * *

"Q. As a matter of fact, earlier in your testimony you stated there were three or four possibilities as far as might have caused this man to die?

"A. I stated four and now I have given you a fifth.

* * * * * *

"Q. And you say from the report (autopsy) it is not clear as to what the cause of death is in this case?

"A. That is right."

Later testimony of Dr. K. D. was introduced into evidence by way of deposition. Dr. K. D. testified then:

"A. I feel the blow he had to his head which produced the laceration had an immediate and direct effect on him as far as his death is concerned.

* * * * * *

"A. The essential part is that I feel something happened to his man after the blow to his head. I have an opinion concussion has something to do with it, something must have happened. I dont know this, to influence it, and something did happen to produce symptoms that got progressively more severe and he died.

"Q. Then you would have an opinion he had a concussion on March 14th?

"A. Yes, I feel he did.

"Q. Is that the more important to your overall opinion?

"A. Well, I feel it is important, yes.

"Q. Is it an essential fact of your overall opinion?

"A. It is not necessarily the only thing. I am giving you my opinion, and I may have others, but this is the one that's convenient, and I thought you would understand it.

* * * * * *

"A. No, again, I am mentioning, bringing out possibilities of how this man could have died the way he did, the factors that could influence his death.

"Q. All these things were possible?

"A. In my opinion."

Dr. P. testified on behalf of respondents. His testimony was that he was a pathologist; that he made the autopsy on deceased; that he first looked for a laceration or scar on deceased's head but none was identifiable; that he then opened the skull and found a ruptured aneurysm in the right posterior communicating artery; that in his opinion "there was no cause, no causal relationship between the trauma and this ruptured aneurysm * * * ;" that a ruptured aneurysm can occur with normal blood pressure; that the aneurysm of deceased was a congenital condition; that he found no evidence of a concussion by an examination of both the outside and inside of the skull.

Dr. W. testified by deposition on behalf of respondent. He stated that on March 14, 1961, he saw deceased in the emergency room of a hospital; that deceased had a laceration of the scalp approximately three-fourths of an inch long and that it was located in the center of the top of the skull; that deceased walked into the hospital, that he talked coherently, and that witness noticed nothing irregular about deceased in his speech or behavior; that he cleansed the wound and closed it with four stitches; that it was a "simple laceration of the scalp"; that he saw deceased again on March 17th and on March 21st, and that deceased did not complain of headaches; that in his opinion there was no relationship between the injury and the subsequent death.

A Dr. T. D. testified for respondent by deposition. He testified that he saw deceased on March 14, 1961, when he came to the hospital; that he noticed the "small cut on the top of his head"; that in his opinion there was no causal connection between the injury and the subsequent death.

A trial judge of the Industrial Court entered an order finding, among other things, that deceased had sustained an accidental personal injury on March 14, 1961, to his head which resulted in his death on May 16, 1961, and awarded compensation to claimant and the minor children. The order and award were vacated on appeal to the court en banc and the claim for compensation was denied.

Claimant urges that the Industrial Court erred under five propositions. Four of these can be summarized as follows: The Industrial Court erred as a matter of law in that claimant's evidence conclusively shows that deceased's death was due to an accidental injury arising out of and in the course of his employment, and that the Industrial Court's order is contrary and in conflict with the material evidence.

■ We disagree that this review can be decided on a question of law. The question for determination is whether the evidence reasonably supports the order of the Industrial Court. Greer v. Sinclair Pipe Line Co. et al., Okl., 356 P.2d 356; Lacy v. Pratt Food Stores, Okl., 347 P.2d 788; Ware v. Wilson & Co., Okl., 322 P.2d 204; Price v. Spartan Aircraft Co., Okl., 275 P. 2d 705.

Claimant urges that it is a well established rule the cerebral hemorrhages which occur as a result of the employment constitute an accidental injury within the Workmen's Compensation Act and cites and relies on Special Indemnity Fund v. McFee, 200 Okl. 288, 193 P.2d 301; Tulsa Frozen Foods Co. v. Pendergrift, Okl., 317 P.2d 1115; and Anderson-Prichard Oil Co. v. Floyd, Okl., 340 P.2d 943, to support this assertion.

We agree with the rule in the cited cases, supra, but find they are not analogous to the case at bar. In all of the referred-to cases, the question presented and determined was that there was sufficient evidence to support the award for claimant. In those cases the lower court found that the disability or deaths from hemorrhage resulted from an accidental injury.

■ The question in the instant case was not the cause of death. That was agreed to, as was the accidental injury. But was the death of deceased a result of the accidental injury? We hold the issue presented was

one of fact arising on the conflict of evidence.

■ It is the general rule, and has been so stated by this Court many, many times, that in an action to review an order of the State Industrial Court, this Court will not review conflicting evidence on non-jurisdictional questions to determine the weight and value thereof and where an order of the lower court is supported by competent evidence, the same will not be disturbed by this Court. Anderson v. Bills Bakeries, Okl., 393 P.2d 524 (35 OBJ 1245); Socony Mobil Oil Co., Inc. v. Cox, Okl., 372 P.2d 8.

Drs. P. W. and D. testified that in their opinion there was no causal connection between the accidental injury and the death of deceased.

Claimant also contends that there was inadmissible evidence admitted at the trial. Claimant argues that she "preserved her record as to the form of hypothetical questions asked both Dr. W. and Dr. T. D., and that the same did not include all of the evidence shown by the record, * * *."

■ Assuming the hypothetical questions propounded to Drs. D. and W. be considered improper or faulty for failure to recite some matters in evidence, we do not consider error resulted from allowing the answers admitted in evidence. This is for the reason that there was other competent expert testimony sufficient to sustain the order of the Industrial Court without consideration of the testimony claimed to be inadmissible. There being other competent testimony, and in the absence of a showing of prejudice, the argument relative to error concerning inadmissible testimony in this respect is without substantial merit.

We have examined the evidence and hold that the Industrial Court's finding is reasonably supported by the evidence.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, JOHNSON, WILLIAMS, BLACKBIRD and IRWIN, JJ., concur.